UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/24/17

UNITED STATES OF AMERICA

    - v. -

                :      **SEALED INDICTMENT**

MICHAEL MENDLOWITZ,
    a/k/a "Moshe Mendlowitz,"   :     17 Cr.
RICHARD D. HART,
    a/k/a "Rick Hart,"    **17 CRIM 248**

       Defendants.   :

- - - - - - - - - - - - - - - - - - X

**COUNT ONE**
**(Conspiracy to Commit Mail Fraud and Wire Fraud)**

The Grand Jury charges:

### OVERVIEW OF THE FRAUD SCHEME

1.    From at least in or about 2009 through at least in or about July 2015, Commerce Payment Systems did business as a payment card processor for its merchant-customers, who were merchants and small businesses that accepted credit cards and debit cards from consumers.  Commerce Payment Systems' management and employees operated under a variety of corporate names, including "Commerce Payment Systems," "Commerce Payment Group," "Merchant Commerce," "Empire Payments," "Evolution Bankcard," and "Optimal Bankcard" (collectively referred to herein as "CPS").

2.    From at least in or about 2010, through at least in or about July 2015, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz,"

and RICHARD D. HART, a/k/a "Rick Hart," the defendants, orchestrated and participated in a scheme to defraud the merchant-customers of CPS. In the course of the scheme, MENDLOWITZ and HART used false and deceptive statements to market and sell CPS's services as a payment card processor. Specifically, the fees and other charges that CPS collected from its merchant-customers for providing CPS's payment card processing services far exceeded what CPS represented to its merchant-customers in CPS's marketing materials, sales calls, and written agreements. In addition, MENDLOWITZ further concealed these overcharges from CPS's merchant-customers, and, when such merchant-customers called to complain, caused the employees of CPS to continue to make false statements to such merchant-customers.

## Background

3.    Merchants who accept major brands of credit cards and debit cards typically use the services of payment card processors. A payment card processer acts as an intermediary between the merchant, the merchant's bank, the cardholder's bank, and "Card Associations," such as Visa, MasterCard, and Discover, to assist in processing the sales proceeds, and to ensure that the merchant receives payment for a credit or debit card purchase by a consumer.. As part of this process, a

2

merchant typically enters into an agreement or contract with a payment card processor, pursuant to which the merchant agrees to pay various fees to the payment card processor in exchange for the processor's services.

4.    Fees that payment card processors charge their merchant-customers are calculated in various ways.  For example, such fees may be calculated as a percentage of a sales transaction, as a "per item" or "per transaction" fee, or as a regularly recurring monthly or annual fee.

## CPS Operations

5.    At all times relevant to this Indictment, the majority owner of CPS was a large payment processing company (the "Parent Company"), while a minority of CPS was owned by MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant.

6.    Beginning in or about April 2009, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, on behalf of Commerce Payment Group, entered into a series of written agreements with the Parent Company, governing the operations of CPS and its relationship with the Parent Company, as well as the processing of funds.

7.    At all times relevant to this Indictment, pursuant to agreements between the Parent Company and Commerce Payment Group, CPS performed various business functions in accordance

3

with procedures established by the Parent Company, while using software, computer systems, and other systems provided by the Parent Company. CPS performed such functions as marketing and sales, obtaining signed service agreements (called "Merchant Applications") with new merchant-customers, and thereafter inputting the relevant information about new merchant-customers and Merchant Applications into computerized systems used by the Parent Company to process payments and fees.

8.    After CPS approved the Merchant Application of a new merchant-customer, certain CPS employees were responsible for entering the new merchant-customer's billing information into computer systems used by the Parent Company. Such information included details about the fees that a particular merchant-customer would be charged. These computer systems generated such charges regardless of what was in the customer's signed Merchant Application, and regardless of what the customer had been told during sales calls.

9.    Once a merchant-customer began using the services of CPS, the Parent Company performed such functions as routing the funds generated by the sales made in the merchant-customer's store or business, minus the fees retained by the Card Associations and the bank that had issued the credit card or payment card to the cardholder-shopper. The Parent Company

4

thereafter credited CPS's fees to CPS, based upon information that CPS had inputted into the computer systems of the Parent Company, and caused the remaining net sales proceeds to be forwarded to CPS's merchant-customer, from bank accounts in the Southern District of New York.  In sum, this meant that for any given transaction, the amount of money sent to a merchant-customer was reduced by the fees retained by the CPS, the Parent Company, and other entities.

10.  After CPS's merchant-customers received these net proceeds, CPS also caused additional fees to be collected from its merchant-customers.  These additional fees included various monthly and annual fees, among others.

11.  In or about 2013, CPS received over $9.9 million from more than 12,000 merchant-customers.  In or about 2014, CPS received over $13.5 million from more than 11,500 merchant-customers.  In or about the first half of 2015, CPS received more than $6.6 million from its merchant-customers.

### The Defendants

12.  At all times relevant to this Indictment, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, was the president and chief executive officer of CPS, as well as the owner of a minority share of CPS.  In his capacity as president and chief executive officer of CPS, MENDLOWITZ supervised and

5

oversaw all CPS departments and operations. Among other things, MENDLOWITZ was closely involved in preparing false and fraudulent marketing materials and websites, causing sales staff to be provided with false and fraudulent written scripts of sales pitches, setting fee and charge schedules, designing and preparing customer agreements, directing employees on how much to charge merchant-customers - including ways to fraudulently overcharge such merchant-customers - directing employees on how to handle complaints from merchant-customers, and interacting with and deceiving the Parent Company. MENDLOWITZ also directed the creation of a website called bestpaymentprocessors.com, which purported to be an independent website that evaluated and compared payment card processors, but in truth and in fact was owned by MENDLOWITZ and used to promote CPS.

13. RICHARD D. HART, a/k/a "Rick Hart," the defendant, was employed at CPS from in or about November 2011 through in or about February 2015. For most of that time, HART was the supervisor of the majority of CPS's sales representatives, and held himself out at times as an executive of CPS and its various corporate affiliates. For example, at various times HART held himself out as the "Vice President of Sales," as well as the president of Empire Payments, the president of Evolution Bankcard, and the president of Optimal Bankcard.

6

14.  In his capacity as a supervisor of CPS's sales staff,
RICHARD D. HART, a/k/a "Rick Hart," the defendant, among other
things, developed and wrote false and fraudulent scripts and
training materials to be used by sales representatives and
instructed sales representatives to make specific
misrepresentations to potential merchant-customers about
particular fees and other terms of service.  HART also prepared
marketing materials, including fraudulent "cost comparison
calculators" that purported to compare the rates that merchants
were paying with other credit card processing companies with
rates that the merchants would be charged by CPS.  In truth and
in fact, however, these cost comparison calculators were
designed to deceive potential merchant-customers by concealing
fees that they ultimately would be charged by CPS.  HART also
participated in fraudulent sales calls, and distributed
recordings of those calls to sales representatives, as
instructional models on how to conduct sales calls with
potential merchant-customers.  HART also assisted in creating
websites for CPS corporate affiliates, as well as in making
changes and additions to the bestpaymentprocessors.com website.

## MEANS AND METHODS OF THE CONSPIRACY

15.  MICHAEL  MENDLOWITZ,  a/k/a  "Moshe  Mendlowitz,"  and
RICHARD D. HART, a/k/a "Rick Hart," the defendants, carried out

their scheme through means and methods that included false marketing, misrepresentations by CPS's sales staff to potential merchant-customers, and misrepresentations to merchant-customers when the merchant-customers called to complain about overcharges. In addition, MENDLOWITZ made false statements to representatives of the Parent Company and directed CPS employees to impose additional improper undisclosed fees.

## False Marketing

16.    In furtherance of the scheme, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, caused CPS to include false and misleading statements on the websites and marketing brochures of CPS and its corporate affiliates.  For example, these websites and brochures:

a.    advertised fees that were far below the fees that merchant-customers would actually be charged, and added the false claim that there were "no hidden fees," when in truth and in fact, CPS charged its merchant-customers a variety of hidden fees;

b.    falsely stated the number of customers that the various CPS corporate affiliates had, and the number of years that those affiliates had been in business;

8

c.    listed a variety of entities that were falsely described as customers of CPS; and

d.    provided written and video testimonials from purportedly satisfied merchant-customers, when in truth and in fact, many of the persons featured in those testimonials:

i.    did not exist or were not CPS customers; or

ii.   were privileged associates and family of MENDLOWITZ who did not pay most of the undisclosed fees that CPS charged to the rest of its customers.

17.   Through CPS's marketing and sales activities, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others, took steps to conceal from potential and existing merchant-customers, the fact that "Commerce Payment Systems," "Merchant Commerce," "Empire Payments," "Evolution Bankcard," and "Optimal Bankcard" were actually all operated by the same management and employees, operating from the same office.  MENDLOWITZ and HART undertook such concealment in part because certain of the CPS-affiliated companies suffered, over time, from increasingly negative reputations on the internet, caused in part by a large number of consumer complaints about, among other things, undisclosed fees

9

charge by the CPS-affiliated companies. Such concealment included:

a. using different corporate logos, different websites, different mailing labels, and different telephone lines, with employees answering those lines differently depending on which company they were purporting to represent;

b. assigning CPS employees multiple email addresses, in order to make it appear that different corporate names represented different companies;

c. expressly denying to potential and existing merchant-customers that CPS's affiliates were related;

d. launching "Evolution Bankcard" under a new name, to distance it from the negative ratings and reputation of CPS, and then concealing Evolution Bankcard's relationship with CPS; and

e. later launching "Optimal Bankcard," essentially to replace "Evolution Bankcard," which had itself developed many negative ratings and reviews on the internet, and then concealing Optimal Bankcard's relationship with CPS.

18. To further support the fraudulent marketing of CPS and its various corporate components, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, together with others, created and utilized the

10

website bestpaymentprocessors.com to advance their fraudulent scheme in various ways, including the following:

      a.    After registering the bestpaymentprocessors.com domain name on or about May 2, 2013, MENDLOWITZ worked with website designers to make the website appear to be an independent website that provided comparative information about different payment card processors, including CPS affiliates.

      b.    From in or about August 2013 through at least in or about the fall of 2014, MENDLOWITZ and website designers whom he hired arranged for Evolution Bankcard -- a CPS corporate component whose sales force was supervised by HART -- to appear as the #1 top-rated payment card processor on the website bestpaymentprocessors.com.

      c.    On or about October 30, 2013, MENDLWOTIZ sent a series of emails to a website designer contracted by CPS, instructing the designer to take steps to conceal MENDLOWITZ's and CPS's connection with the website bestpaymentprocessors.com.

      d.    From in or about late 2014, after MENDLOWITZ and HART began to market the new CPS corporate affiliate "Optimal Bankcard," MENDLOWITZ and HART worked with website designers to arrange for Optimal Bankcard to replace Evolution Bankcard as the #1 top-rated payment card processor on bestpaymentprocessors.com.

11

19. In or about December 2014, when MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, launched Optimal Bankcard, MENDLOWITZ and HART worked with graphics and website designers contracted by CPS to create new marketing materials for Optimal Bankcard, including a new webpage and new marketing brochures, filled with false information. For example:

a. The Optimal Bankcard marketing materials falsely stated that Optimal Bankcard had been in business for ten years; and was "trusted by over 300,000 merchants," including a variety of national chains of hotels, restaurants, and stores, and a university.

b. The Optimal Bankcard marketing materials falsely stated that Optimal Bankcard charged no "hidden fees," and that there was a "$0 Annual Fee." In truth and in fact, Optimal Bankcard charged a number of annual fees that were concealed from merchant-customers, including an annual "membership fee."

c. The Optimal Bankcard marketing materials contained written "testimonials" from purportedly satisfied customers who, in truth and in fact, did not exist or were not customers of CPS or Optimal Bankcard. HART provided some of these testimonials to a website designer on or about December 15, 2014, and instructed the website designer to find racially

12

and ethnically diverse photos on the internet, which could be
used as purported photos of the non-existent merchants.

20. In or about July 2015, MICHAEL MENDLOWITZ, a/k/a
"Moshe Mendlowitz," the defendant, registered a new website,
toprankedprocessors.com, and began taking steps with a website
designer to use toprankedprocessors.com in the same manner that
MENDLOWITZ and RICHARD D. HART, a/k/a "Rick Hart," the
defendant, had previously used bestpaymentprocessors.com.

## Misrepresentations by CPS Sales Representatives

21. In furtherance of the scheme, MICHAEL MENDLOWITZ,
a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick
Hart," the defendants, controlled the procedures by which CPS's
sales personnel interacted with potential merchant-customers,
ensuring, among other things, that they adhered to deceptive
written scripts, and providing such sales representatives with
training, practice sessions, and model examples of recorded
telephone sales calls.

22. MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and
RICHARD D. HART, a/k/a "Rick Hart," the defendants, directed
CPS's sales representatives to follow specific scripts, which
contained false, fraudulent and misleading statements about the
fees that customers would be charged. Such scripts, as well as
instructions and example telephone calls provided by HART,

13

directed sales representatives to make false statements about such matters as whether additional undisclosed fees would be imposed, whether certain fees would be waived, whether certain rates were guaranteed, how customers could access their bills, and whether additional fees and charges would be withdrawn directly out of customers' bank accounts.

23. RICHARD D. HART, a/k/a "Rick Hart," the defendant, and CPS sales representatives made numerous misrepresentations to potential merchant-customers during sales calls. For example, HART and the CPS sales representatives made numerous false statements to potential merchant-customers about the fees they would be charged by CPS, and denying that there were any annual fees. In truth and in fact, and as HART well knew, merchant-customers were charged fees that were several times larger than the fees quoted to them during sales calls, and were charged various annual fees exceeding $195 per year.

24. After potential merchant-customers submitted signed Merchant Applications to CPS, CPS sent such potential merchant-customers emails that falsely stated in part, "Important Note: Each and every rate that is agreed on this application will be set in for the lifetime of the account." In truth and in fact, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, repeatedly caused various fees collected by CPS to be

14

dramatically increased, sometimes by several times the quoted price.

25.    RICHARD D. HART, a/k/a "Rick Hart," the defendant, instructed CPS's sales personnel to use written "cost comparison calculators," which were spreadsheets showing potential customers what their prospective bills would purportedly be with CPS.  HART created and revised the cost comparison calculators, and provided sales representatives with detailed instruction on how to use the calculators.  HART also instructed sales representatives to make similar "cost comparisons" orally during sales calls - and often joined the conversation himself to set forth detailed fraudulent calculations.  In truth and in fact, HART intentionally designed the written and oral cost comparisons so that they generally concealed whole categories of hidden fees, such as recurring annual fees, large surcharges, and other fees and assessments.

### Concealment of the "Merchant Application"

26.    In accordance with procedures implemented by MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, during or immediately after a CPS sales representative spoke with a prospective merchant-customer, the sales representative provided to the prospective merchant-

15

customer a Merchant Application, to be initialed, and signed by the merchant-customer.

27. Although CPS was required by the Parent Company to use a specific form of the Merchant Application, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others, used and caused to be used an altered form of the Merchant Application. In particular, until in or about January 2015 -- when the Parent Company performed an audit inspection at CPS -- MENDLOWITZ caused three pages of the Merchant Application to be removed from the version of the Merchant Application that was provided to CPS's merchant-customers. Those three pages contained the "Merchant Processing Agreement," which in turn contained detailed "Terms and Conditions." The omitted Terms and Conditions related to material aspects of the merchant-customer's agreement, and the terms were often in direct contradiction to the representations that CPS's sales representatives made to potential customers during the sales process. Such omitted terms included that:

a. CPS and the Parent Company reserved the right to alter fees and charges - a clause that directly contradicted representations that CPS employees made to potential customers during the sales process, that fees were "guaranteed for life;"

16

b.    CPS and the Parent Company would notify the customer of such changes only through a notice on the customer's on-line monthly statement - a statement that many customers did not know existed;

c.    such monthly statements and the accompanying notices would not be mailed or emailed to the customer, but would be provided by logging into a website, and would be accessible to the customer only for three months;

d.    that the terms written in the Terms and Conditions "constitute[d] the entire agreement" among the parties, and that all prior "representations, written or oral, made to Merchant are superseded;" and

e.    that the customer could be charged an annual Payment Card Industry ("PCI") fee.  This term directly contradicted written and verbal assurances made to potential customers at the direction of MENDLOWITZ and HART that the customers would not be charged such a PCI fee.

28.    In or about January 2015, when the Parent Company performed an audit inspection of CPS's procedures, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, together with a co-conspirator not named as a defendant herein ("CC-1"), falsely told the Parent Company auditors that CPS was routinely sending the Terms and Conditions of the Merchant Processing

17

Agreement to new customers, but was sending them in a separate communication after a merchant-customer's account was approved. On or about January 16, 2015, in an effort to deceive the Parent Company auditors, MENDLOWITZ and CC-1 prepared fraudulent emails - with fictitious addressees and attachments - that were created to give the false appearance that CPS had sent the Terms and Conditions of the Merchant Processing Agreement to CPS merchant-customers.

29. In or about January and February 2015, after the Parent Company reiterated its requirement that that the Terms and Conditions of the Merchant Processing Agreement be provided to potential customers prior to signing, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others, devised new ways of keeping those customers from seeing the Terms and Conditions, but making it appear as if CPS's clients had reviewed and signed off on the Terms and Conditions. More specifically, MENDLOWITZ and HART caused to be created, and used, a computer device that caused the initials of potential merchant-customers to be copied onto pages of the Merchant Application that those potential customers had not in fact initialed.

18

**Fraudulent Overcharging for Misstated,**
**Undisclosed and Unauthorized Fees**

30. After CPS approved a potential customer's Merchant Application, CPS employees loaded the customer's information into the Parent Company's computer system, which generated the charges that would be imposed upon that merchant-customer, regardless of what was in that customer's Merchant Application and regardless of what that customer had been told during sales calls.

31. MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, CC-1, and others, took steps to ensure that the rates and fees that merchant-customers were to be charged were often several times higher than the rates and fees that had been represented to the merchant-customers during the sales process or set forth in their Merchant Applications. These increased fees were imposed through a number of different mechanisms, including:

a. calculating and collecting percentage fees that were significantly higher than those set forth in the Merchant Applications and that were contrary to representations made by CPS sales representatives during the sales process;

b. collecting percentage fees multiple times, which could only properly be charged once under the terms of the

19

Merchant Applications and according to the representations made by CPS sales representatives during the sales process;

     c.   over-charging merchant-customers for multiple per-transaction fees when only one fee could properly be charged under the terms of the Merchant Applications and according to the representations that CPS sales representatives made during the sales process;

     d.   charging merchant-customers an annual PCI fee of $99.00, purportedly for protective and insurance services, which directly contradicted representations made to potential customers by CPS in the sales and marketing processes that no such fee would be charged;

     e.   charging merchant-customers various fees, including "IRS reporting fees," annual "membership fees," and "inactivity fees," in contradiction to representations made to potential customers by CPS in the marketing and sales processes that no such fees would be charged;

     f.   charging some merchant-customers for "dues and assessments" at rates as much as ten times greater than those reflected in their Merchant Application, and in contradiction to representations made by CPS in the marketing and sales processes;

20

g.    charging some merchant-customers a "network access fee" that was in some cases ten times the fee reflected in their Merchant Applications;

h.    charging merchant-customers for "surcharges" at rates far in excess of those reflected in their Merchant Application, and applying such surcharges to transactions to which they did not properly apply under the terms of the Merchant Application, in contradiction to representations by CPS in the marketing and sales processes; and

i.    arbitrarily and periodically increasing these fees and others, when MENDLOWITZ wished to generate additional revenue.

### Additional Concealment of the Fraud

32.    CPS operated a Customer Service department, which handled customer questions and complaints about charges and overcharges, as well as requests for refunds or cancellation of accounts.  MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, instructed members of the Customer Service department to make a variety of false statements to merchant-customers who complained about charges and overcharges for CPS's processing services.  Such false statements included:

a.    telling merchant-customers who complained that the hidden fees were in fact provided for in the customers' agreements when they were not;

b.    misrepresenting to merchant-customers that certain charges did not originate with CPS but rather with various third parties; and

c.    misrepresenting to merchant-customers that the overcharges imposed upon them were the result of billing errors, when they were in truth and in fact deliberately imposed.

33.    MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, instructed CPS employees in CPS's Customer Service department that they were required to limit the amount of money to be paid each month for refunds, subject each month to MENDLOWITZ's approval.    It was also a common practice of CPS not to pay refunds to merchant-customers who were cancelling their accounts.

**Concealment of the Fraud Scheme from the Parent Company**

34.    MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," the defendant, repeatedly made false and misleading statements to the Parent Company, with the intention of concealing aspects of the fraud scheme.    For example:

a.    In or about October 2013, MENDLOWITZ represented to the Parent Company that CPS would be charging a 2.95%

22

surcharge only on certain credit or debit card transactions. In truth and in fact, however, MENDLOWITZ instructed CPS employees that for most customers they were to impose the surcharge on all transactions, thus greatly increasing the surcharges that those customers were charged.

b. On or about October 31, 2013, after the Parent Company had instructed MENDLOWITZ to lower an assessment fee that CPS was charging its customers, MENDLOWITZ instructed a CPS employee not to lower that assessment fee for CPS's largest customers. MENDLOWITZ subsequently represented to the Parent Company that CPS had lowered the assessment fee for all of its merchant-customers, when in truth and in fact, CPS had not reduced the assessment fee for more than 700 of its largest customers.

## STATUTORY ALLEGATIONS

35. From at least in or about 2010, through at least in or about July 2015, in the Southern District of New York and elsewhere, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Sections 1341 and 1343.

36. It was a part and an object of the conspiracy that MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others known and unknown, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and would and did take and receive therefrom, a matter and thing, and would and did cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, in violation of Title 18, United States Code, Section 1341.

37. It was a further part and object of the conspiracy that MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, and others known and unknown, knowingly and willfully, having devised and intending

24

to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT TWO

(Mail Fraud)

The Grand Jury further charges:

38. The allegations set forth in paragraphs 1 through 34
are repeated, realleged, and incorporated by reference as if set
forth fully herein.

39. From at least in or about 2010, through at least in or
about July 2015, in the Southern District of New York and
elsewhere, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and
RICHARD D. HART, a/k/a "Rick Hart," the defendants, knowingly
and willfully, having devised and intending to devise a scheme
and artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, for the purpose of executing such scheme and artifice

25

and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and took and received therefrom, a matter and thing, and caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, MENDLOWITZ and HART made, and caused to be made, materially false statements to CPS's merchant-customers and its Parent Company about the fees that CPS charged its merchant-customers for payment card processing services, and in connection therewith and in furtherance thereof, MENDLOWITZ and HART sent and received and caused materials to be sent and received using the United States mail and private and commercial interstate carriers.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT THREE

### (Wire Fraud)

The Grand Jury further charges:

40.    The allegations set forth in paragraphs 1 through 34 are repeated, realleged, and incorporated by reference as if set forth fully herein.

41.    From at least in or about 2010, through at least in or about July 2015, in the Southern District of New York and elsewhere, MICHAEL MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a "Rick Hart," the defendants, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MENDLOWITZ and HART made, and caused to be made, materially false statements to CPS's merchant-customers and its Parent Company about the fees that CPS charged its merchant-customers for payment card processing services, and in connection therewith and in furtherance thereof, MENDLOWITZ and HART

27

transmitted and caused to be transmitted interstate electronic
mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

42. As a result of committing the offenses charged in
Counts One, Two, and Three of this Indictment, MICHAEL
MENDLOWITZ, a/k/a "Moshe Mendlowitz," and RICHARD D. HART, a/k/a
"Rick Hart," the defendants, shall forfeit to the United States,
pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c),
any and all property, real or personal, that constitutes or is
derived, directly or indirectly, from proceeds traceable to the
commission of the offenses alleged in Counts One, Two, and Three
of this Indictment, including but not limited to a sum of money
in United States currency representing the amount of proceeds
traceable to the commission of said offenses.

## Substitute Asset Provision

43. If any of the above-described forfeitable property, as
a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due
diligence;

b. has been transferred or sold to, or deposited with,
a third person;

28

c. has been placed beyond the jurisdiction of the

Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which

cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable

property.

> (Title 18, United States Code, Section 981;
> Title 21, United States Code, Section 853(p); and
> Title 28, United States Code, Section 2461(c).)

_____
FOREPERSON

_____
JOON H. KIM
Acting United States Attorney

29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL MENDLOWITZ, a/k/a "Moshe
Mendlowitz," and
RICHARD D. HART, a/k/a "Rick Hart,"

Defendants.

SEALED INDICTMENT

17 Cr.

(18 U.S.C. §§ 1341, 1343, 1349, and 2)

JOON H. KIM
Acting United States Attorney.

*[signature]*

4/24/17 - Filed Sealed Indictment
BC  Case assigned to J Broderick {done error}
*[handwritten]*