**Smith Villazor** LLP
250 West 55th Street, 30th Floor
New York, New York 10019
www.smithvillazor.com

Patrick J. Smith
patrick.smith@smithvillazor.com
T   212.582.4400

SMITH | VILLAZOR

July 15, 2019

**VIA ECF**

The Honorable Vernon S. Broderick
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Michael Mendlowitz*, S2 17-cr-0248 (VSB)

Dear Judge Broderick:

    We write with respect to the upcoming sentencing of co-defendant, Richard Hart, and to address the position that the government is taking with respect to the loss caused by the offense. *See* Government's Sentencing Memorandum at 4-6. As Your Honor knows from Mr. Mendlowitz's trial, the government did not seek to prove up loss and the evidentiary record presents an insufficient basis to draw any conclusion about loss beyond, arguably, the handful of merchant accounts referenced during the trial. Given that Hart's plea agreement stipulates to a loss amount greater than $9,500,000 but not more than $25,000,000, Hart, understandably, is not in a position to challenge the government's proffered methodology.

    We submit that the government's proffered methodology lacks any evidentiary basis of which we are aware, is wrong in its basic approach, and is contrary to industry experience with respect to merchant portfolios consisting of largely smaller merchants or online merchants charged under a tiered pricing model. The government's explanation of how it estimates loss is therefore unreliable and the Court should give it no weight.

    The government's purported loss amount is "based on a reasonable estimate of the difference between the amounts victims paid CPS during Hart's tenure at the company and the fair market value of the payment-processing services those victims received from CPS."[1] Government's Sentencing Memorandum at 5. The government determined the fair market value by "consulting" with representatives from EVO, and reports that "[a]ccording to an EVO

---

[1] The government appears to treat all revenue as attributable to Hart whether or not such revenue was derived from merchants that were signed up by Hart or the sales team he managed. This oversimplification is consistent with its approach to loss in this case.

Hon. Vernon S. Broderick  July 15, 2019
Page Two

representative," other (unidentified) EVO affiliates charged less than 3% for processing services. *Id.* at 5. The government then took CPS's total processing volume (after backing out revenue derived from American Express transactions) and considers amounts over and above the supposed "fair market value" to be fraud loss. *Id.* at 5-6.

Through this methodology, which is not attributed to a finding in Hart's PSR, the government arrives at a loss amount of approximately $17 million, which yields a Guidelines range above the statutory maximum sentence for the offense to which Hart pled. *Id.* at 6. However, the government invites the Court to consider the loss amount as a justification to impose the maximum sentence. *Id.* at 8.

The government's approach to loss is divorced from reality. It wrongly assumes that every merchant in the portfolio was affected by the alleged scheme; that *all* of the revenue generated from each merchant account should be considered and be incorporated into its formula to calculate loss; and that an unattributed, off-the-record statement from an unidentified EVO employee that the round number of 3.0% should be taken as the dispositive benchmark for the fair market value of processing services.

We assume that the government will advance a similar methodology with respect to Mr. Mendlowitz, and we will address the issues with the methodology in full at the appropriate time. That said, because Hart is a co-defendant and the Court's consideration of this issue as it relates to Hart stands to bear on Mr. Mendlowitz, we think it is appropriate to briefly address the most significant issues with the government's methodology here.

First, the government's methodology is highly problematic because it treats all processing revenue (other than AMEX revenue) as tainted by fraud. We would ask the Court to consider the following in this respect.

**Inclusion of all customers.** The government's overly simplistic methodology assumes, without any basis, that every customer was defrauded. Every dollar of processing revenue, from every customer, goes into the "denominator." We know that the government has not done any systematic or statistically significant analysis to determine whether and which customers were billed rates and fees higher than what was disclosed in written materials. The methodology foregoes any such effort and simply assumes that all customers were defrauded. As but one specific example of why this methodology is untenable, it stands in direct contradiction to a key theme the government advanced at trial, which is that Mr. Mendlowitz did not defraud his "friends and family" or "platinum" customers. The government's position is that those merchants were not defrauded, yet counts revenue derived from those merchants in its analysis.

Not only that, the methodology assumes that all customers were impacted the same way. It was clear at trial that not all merchant accounts were impacted similarly. This approach not only includes all merchant accounts, but treats them all the same. This is unreliable and inconsistent with evidence in the record.

**Disregard for written disclosure.** The government's approach completely ignores written disclosures. Under the government's methodology, even rates and fees charged according

to a signed merchant agreement are treated as fraud loss. In other words, any amount over 3.0% is fraud, even if the customer agreed to pay it. That is not appropriate and not supported by the record, where there was near unanimous agreement for the unremarkable proposition that a rate or fee was valid if disclosed on an application.

With respect to these two related issues, it is no answer to point to the allegedly fraudulent sales pitch. We know that the government has listened to an infinitesimal fraction of the sales calls it seized from CPS, and at trial, offered only a handful of those calls as evidence. There is no basis to find that the entire portfolio of customers was defrauded through the sales pitch (a dubious premise to begin with in light of the subsequent written disclosures, which the evidence shows customers read and assented to).

Second, the government's "fair value" amount may as well be plucked out of thin air. With no explanation or detail other than that the number comes from EVO, the government says that fair value for processing services is 3.0%. No detail is provided about the precise source of that number, and thus the Court has no information upon which to consider its accuracy. Even if 3.0% were accurate, no context is provided such that the Court could consider whether it provides an apples-to-apples comparison for CPS, which the government knows serviced a large percentage of small, risky, startup businesses.[2] Further, there appears to have been no consideration given to the fact that low-processing or non-processing merchants, if charged fixed fees (like an annual PCI or IRS fee), would skew an average processing rate significantly higher. No information is provided to evaluate whether the fair value figure accounts for this type of nuance, and it does not appear to. Rather, it is a blunt instrument used solely for convenience. True as it may be that a district court need only make a "reasonable estimate" of loss, certainly the Court must require more of the government than this.

More to the point, putting aside the government's unprincipled approach, and the fact that it does not take into account any differences in merchant base or business model, the 3.0% figure is not a reasonable estimate for these purposes. Large processing providers used by millions of merchants, such as Stripe and PayPal currently charge rates over 3.0%. Stripe, for instance, charges a flat rate of 2.9% plus 30 cents. Stripe, Inc., https://stripe.com/pricing (last visited July 15, 2019). On a $30 ticket, for example, Stripe's processing services cost 3.9%, almost a full percentage point above the government's so-called fair market value. And, this is years after the indictment period, despite the fact that processing costs would naturally tend to go down over time as the industry becomes more crowded and competitive, and technological advances increase options and efficiency.

The importance of this number cannot be understated. Consider that if instead the government chose 3.5% as the fair market value for processing services, Hart's loss amount, all else being equal, would decrease from approximately $17 million to approximately $12.9 million. This difference is significant.

Given the obvious issues with the government's approach to loss, the Court should afford little weight to the government's loss calculation in connection with Hart's sentencing. Mr.

---

[2] It is also worth noting that in an apparent desire to ramp up sentencing exposure, the government has reduced the fair market value of processing services to 3%, down from 4%, which was its position during plea discussions.

Hon. Vernon S. Broderick  July 15, 2019
Page Four

Mendlowitz will be prepared to address these issues in more detail assuming the government adopts a similar approach as part of his sentencing proceedings.

                Respectfully submitted,

                /s/ Patrick J. Smith

                Patrick J. Smith
                Smith Villazor LLP

Case 1:17-cr-00248-VSB   Document 201   Filed 07/15/19   Page 4 of 4