UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

––––––––––––––––––––––––––––––––––X
UNITED STATES OF AMERICA,

               17-Cr-248 (VSB)

  v.

RICHARD HART,        MOTION TO REDUCE SENTENCE
               PURSUANT TO
               18 U.S.C. § 3582(c)(1)(A)(i)
     Defendant.
               (COMPASSIONATE RELEASE)

––––––––––––––––––––––––––––––––––X

## Introduction

Richard Hart respectfully renews his motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Hart is serving a 1-year and 1-day term of incarceration. The Bureau of Prisons ("BOP") lists his projected release date as August 17, 2020. (Exhibit A) Mr. Hart seeks a reduction of his sentence of incarceration to time served with whatever conditions the Court deems appropriate.

On April 2, 2020, Mr. Hart moved this Court for compassionate release. Mr. Hart renews his motion pursuant to this Court's Opinion and Order of April 27, 2020. (ECF Dkt No. 257, April 27, 2020, Opinion and Order) ("Order") The warden from the MDC has not responded to Mr. Hart's formal request for compassionate release or furlough, emailed by counsel to the Bureau of Prisons ("BOP") Legal Department March 31, 2020. More than 30 days have elapsed.[1] The exhaustion requirement has been met.[2]

---

[1] Mr. Hart informed defense counsel that his request to the BOP was rejected. Counsel was not advised by the BOP. Upon learning this, defense counsel immediately emailed BOP

1

Mr. Hart is renewing his motion for the following reasons:

1) The death of Mr. Hart's brother-in-law, who was acting as the primary caregiver to Mr. Hart and his wife Megan's son has placed the well-being of their child in jeopardy.

2) Mr. Hart has asthma and hypertension, two conditions that put him at higher risk of contracting the coronavirus and of dying if he does contract the illness.

## STATUTORY FRAMEWORK AND GUIDELINES COMMENTARY FOR SENTENCE REDUCTION AUTHORITY UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).

The statute provides:

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier**,** may reduce the term of imprisonment (and may impose a term of probation or supervised

---

legal requesting a copy of the warden's decision to document that the exhaustion requirement had been satisfied. Subsequently, defense counsel learned that the Assistant United States Attorney ("AUSA") who is representing the government in this case did not have notice of the decision or a copy of the letter. The AUSA then joined in a request to the BOP sent by email to the legal department on April 23, 2020. To date, the BOP has failed to respond to this joint request.

[2]This Court denied the requested relief without prejudice to Mr. Hart's right to renew his motion after 30 days or a final decision of the BOP.

release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

> (i) extraordinary and compelling reasons warrant such a reduction; . . .

\*\*\*\*\*

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. (18 U.S.C. § 3582(c)(1)(A)).

Thus, the statutory requirements for sentence reduction are that a court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements. The United States Sentencing Guidelines (U.S.S.G.) policy statement in regards to 18 U.S.C. § 3582 sets forth in its commentary examples of extraordinary and compelling circumstances. The commentary specifically includes as one basis for ordering compassion release, "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children." (U.S.S.G. 1B.13 App. (1)(C)(i).)

A. The Death of the Hart's Brother-In-Law, Which has placed the well-being of their son in Jeopardy, is an Extraordinary and Compelling Reason Expressly Identified in Commentary to U.S.S.G. § 1B1.13 App. (1)(C)(i)

As the Court knows from having sentenced Mr. Hart, his ███████████████. (Exhibit B, C and D) Since Mr. Hart's incarceration, his wife relied on her sister and her brother-in-law to care for their son. On January 12, 2020, Mr. and Ms. Hart's brother-in-law suddenly and tragically passed away after ingesting a pine nut and going into anaphylactic shock. (Exhibit E) Mr. Hart's wife, Megan, works at an assisted living home and is an essential employee. Ms. Hart's ability to obtain alternate childcare is limited. Ms. Hart works as a caregiver at the

local living assistance home at the Orchard Estate of Woodbury. Since March of this year, when the scope and possible effects of COVID-19 became clear, people have been unwilling to take her son, fearing that because of work exposure she may have been exposed to the coronavirus. Ms. Hart is an essential worker and she needs the income her employment generates. (Exhibit F) She has no choice but to work. As a result, the only caregiver who is available to her under these new circumstances is her mother. Mrs. Hart's mother is ▮▮▮▮▮▮▮▮▮▮▮▮, and as a result, must not interact with anyone who might be in regular contact with the coronavirus. Thus, in order for Ms. Hart to maintain her current employment as an essential worker, she has had to have her son live full-time with her mother. This arrangement is a strain on all parties and traumatic to the Harts' son. The son has been removed from the environment that he is comfortable in, which has made his care that much more difficult. Particularly in light of his ▮▮▮▮▮, it is important the Harts' son have a stable and consistent environment. Releasing Mr. Hart now to permit him to shelter in place at home would bring normalcy and stability to his son.

**B.   Richard Hart's Vulnerability to COVID-19 Is an Extraordinary and Compelling Reason for a Sentence Reduction to Time Served and Immediate Release from Prison.**

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (10th ed. 2014). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.*

Mr. Hart suffers from asthma and hypertension. According to the Centers for Disease Control and Prevention ("CDC"), "[b]ased on currently available information and clinical

4

expertise, **older adults and people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19".

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

The CDC includes "moderate to severe asthma" and "serious heart conditions" on its list of underlying medical conditions that put people of all ages at higher risk.

1. *The Court Has Authority to Find Extraordinary and Compelling Reasons Other than Those Expressly Identified in Commentary to U.S.S.G. § 1B1.13.*

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, App. n. 1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still anticipates a motion filed by the BOP. Since there has not been a quorum on the United States Sentencing Commission since the enactment of the First Step Act, it is not possible for the Commission to propose amendments to the Guidelines to reflect the new

statutory scheme. Awaiting new members to be nominated to the Commission and approved by Congress to explicitly address the statutory changes before the crisis abates may well be futile. *See United States v. Cantu-River*a, 2019 WL 2528272 * fn 2 (S.D. Tex. June 24. 2019)("…the current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to a lack of a sufficient number of serving members of the Sentencing Commission." *citing United States v. Handerhan*, No. 1:10 CR 298, 2019 WL 1437903 at * 1 n 4 (M.D. Pa. 2019)). "Because the current version of the Guideline policy statement conflicts with the First Step Act the newly-enacted statutory provisions must be given effect." *Id., citing United States v. Conrado Cantu*, No. 1: 05 Cr 458 (S.D. Tex. June 17, 2019). *See also United States v. Ebbers*, __ F.Supp.3d. __ 2020 WL 91399, at* 4 n 6 (S.D.N.Y. Jan. 8, 2020)("The First Step Act reduced the BOP's control over compassionate release and vested greater discretion with the courts. Deferring to the BOP would seem to frustrate that purpose.")

For that reason, "a growing number of district courts have concluded the Commission lacks a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Similarly, in

*United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020), the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." *Rded*, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020). Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even when courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment addressing the changes generated by the First Step Act, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those specifically listed. *See e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (Internal quotation marks omitted).)

The government conceded this point in *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *2 (M.D. Tenn. Mar. 4, 2020). The government agreed that "the

7

dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Young,* 2020 WL 1047815*,* at *6.[3]

Accordingly, this Court has authority to consider whether the worsening pandemic, the spike in reported cases within the BOP, the climbing infection rate and death toll combined with the other relevant circumstances in this case, including Mr. Hart's medical history of high risk conditions, present an extraordinary and compelling basis for a sentence reduction, regardless of whether the pandemic falls within one of the existing categories in § 1B1.13 commentary.

---

[3] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law") (citing ten other cases); *Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).)" (Internal citation omitted.)

> 2. *COVID-19 Is an Unprecedented and Rapidly Expanding Global Health Emergency that Presents a Serious Risk Inside Prisons and Especially to Vulnerable Prisoners.*

COVID-19 has infected more than 7,277,489 people worldwide, leading to more than 412,111 deaths. *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://coronavirus.jhu.edu/map.html  The number of confirmed COVID-19 cases continues to rise, but reported numbers under represent the true scope of the crisis—experts believe that the United States still isn't testing enough people to detect the outbreak's true spread. *CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. ("CDC Guidance.")

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. Even when prisons are neither overcrowded nor unsanitary, prisoners are at increased risk for airborne pathogens such as coronavirus. The Centers for Disease Control and Prevention ("CDC") recognizes that, "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." *CDC Guidance*. The CDC has also commented on the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

9

*Id.*

*See also*, *United States v. Rodriguez*, No. 03 Cr 271-1 (AB), 2020 WL 1627331 at *8 (E.D. Pa. Apr. 1, 2020)("prisons are ill equipped to prevent spread of COVID-19", citing affidavit of Joseph J. Amon, an infectious disease epidemiologist who has studied infectious disease in detention settings.)

COVID-19 has made substantially and alarmingly fast inroads in the BOP, reaching more than 15 locations as of April 8, 2020, a week after Mr. Hart first requested Compassionate Relief. Today the BOP reports that 65 BOP facilities and 27 Residential Reentry Centers ("RRCs") have inmates who have tested positive for COVID-19. These are just the confirmed infections. There is no information on the BOP site about how many inmates have been tested. In fact, the BOP claims that at the MDC there is currently 1 inmate and 6 staff with active coronavirus. The facility claims that 5 inmates and 34 staff have recovered, bringing the cumulative numbers of COVID-19 infections to 6 inmates and 40 staff. www.bop.gov/coronavirus.com (providing daily tallies of confirmed infections). According to the BOP website there are 1,591 inmates currently at the MDC.

3. *Richard Hart Runs a High Risk of Serious Illness or Death if he Contracts COVID-19.*

The CDC and other medical authorities have made clear that COVID-19 is especially dangerous for specific people, including those with severe chronic medical conditions. Those with certain serious health concerns— asthma and hypertension – are also especially vulnerable to and at high risk for serious complications from COVID-19, including death. *See*

10

https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html. And *See* https:/cdc.gov/coronavirus/2019-ncov/nee-extra-precautions/asthma.html.

## HEALTH ISSUES[4]

Richard Hart has two significant health issues. His medical records clearly reflect that he is afflicted with hypertension and is prescribed medications for asthma to maintain his health. (Exhibit G, p. 2 and 6).

---

[4] To answer the questions of the Court's Order: 1) Mr. Hart was first diagnosed with asthma as a child by Dr. Drizan. (Exhibit H, p. 1). 2) Mr. Hart was first diagnosed with high blood pressure at the MDC on March 18, 2020. The New Non-Medication Orders were to have his blood pressure monitored weekly. (Exhibit G, p. 6 ) Days after his hypertension diagnosis the coronavirus hit and the MDC went on lockdown. There is nothing to indicate his blood pressure was ever monitored again in accordance with MDC's own orders. (Id., P.1-6) 3) There is nothing in Mr. Hart's chart indicating what the cause of his high blood pressure is or that any attempt was made to determine its cause. 4) Mr. Hart has been prescribed Albuterol, Mometasone Furoate and Prednisone for his asthma. (Id., p. 2) 5) Mr. Hart has not been prescribed any medications for his high blood pressure nor has any physician followed up on his original diagnosis of high blood pressure since it was first diagnosed. Coronavirus protocols were initiated, and, as a result of the total lockdown of the facility, no follow-ups occurred despite the orders issued by the BOP medical department. 6) Mr. Hart was first prescribed medication for his asthma as a child. Before going to the MDC he was last prescribed Albuteral for his asthma in October 2019. (Exhibit H, p.1) Most recently, after medical personnel at the MDC examined him in his cell he was prescribed Albuterol and Mometasone. (Exhibit G, p. 2) 7) The BOP diagnosed Mr. Hart with high blood pressure and has prescribed him medication for asthma. Despite prescribing him the medication for asthma his chart notes that they are "not making official dx today". (Id., p. 2) 8) The BOP is now providing Mr. Hart with medication for asthma but is not only not providing him with medication for his high blood pressure, they are not following non-medication orders issued by the medical department to monitor the condition it had diagnosed. 9) High blood pressure alone could be enough to place Mr. Hart at higher risk of serious illness or death from coronavirus. According to Webmd, early research shows that people with high blood pressure may be more likely to get coronavirus, have worse symptoms and even die from infection. According to the site, the risk of death to people with high blood pressure is 6% higher than the overall population. https://www.webmd.com/lung/coronavirus-high-blood-pressure#1

11

There is much uncertainty about coronavirus. There have been conflicting reports from the scientific community as to exactly how much more likely an individual is to die from the virus based on their high-risk conditions. One thing has been documented beyond dispute; coronavirus is potentially deadly even to healthy individuals of varying ages. The addition of high risk conditions and age can only serve to heighten the peril of death for individuals like Mr. Hart.

While Mr. Hart is at greater risk of dying from COVID-19 it is impossible for him as an inmate at the MDC to follow the CDC's recommendations to protect himself from exposure to this highly transmissible disease.[5] Mr. Hart now lives in a dorm-like setting with other inmates, all of whom share telephones. They live together and eat together and share computers with each other. The potential for the disease to be introduced into the facility by employees or any others who enter the facility on a daily basis – and spread unchecked – is enormous. Attorney General Barr himself has admitted, that "while BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions." Memorandum of Attorney General William Barr, April 3, 2020.  (Exhibit I)

Richard Hart's high-risk conditions make him particularly vulnerable to catching coronavirus and succumbing to the virus. The conditions at the MCC are particularly conducive to the spread of the virus and the likelihood that he will contract it and potentially die is

---

[5] *See annexed* affidavit of Dr. Brie Williams, Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program; Director of UCSF's Criminal Justice & Health Program. (Exhibit J)

significantly higher than if the Court were to grant this motion and allow him to shelter at home with location monitoring and the strictest conditions the court deems necessary.

C. **Courts Responding to the Coronavirus Pandemic Have Recognized the Critical Importance of Reducing Incarcerated Populations, the Risk to Society and the Risk to the Particularly Vulnerable Inmates to Extreme Complications from the Disease.**

Although this Court must make its own determination of what is appropriate in this case, numerous courts have considered coronavirus when reducing sentences based on Compassionate Release or the FSA-retroactivity provision in the First Step Act. Defense counsel is prepared to provide a significant number of citations reflecting the court orders in this District, the Eastern District of New York and elsewhere granting release based on the pandemic should this Court so request. Suffice it to say that coast-to-coast, courts' response to COVID-19 reflects the extreme exigency of the present circumstances, especially for those individuals most vulnerable based on high-risk conditions.

D. **Consideration of the § 3553(a) Factors, Including the COVID-19 Pandemic, Should Lead the Court to Conclude that Reducing Richard Hart's Sentence to Time Served Would Generate a Sentence that is Sufficient, but not Greater than Necessary, to Accomplish the Goals of Sentencing**

When extraordinary and compelling reasons are established, 18 U.S.C. §3582(c)(1)(A)(i), requires a court to consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. Under all of the circumstances in this case, the Court should conclude that the time that Richard Hart has already served in conjunction with the risks posed by his high risk conditions, and the death of his son's caretaker is sufficient to satisfy the

13

purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1)).**

 a. **Nature and circumstances of the offense**

The nature and circumstances of this offense have not changed with the passage of time. Mr. Hart accepts responsibility for his part in defrauding small business owners, and he shows remorse for his conduct.

 b. **History and Characteristics of the Defendant.**

The many difficulties faced by Mr. Hart in his early years are set forth in the "Personal and Family Data" section of the PSR (¶¶ 92-100), in his sentencing submission, and in the various letters submitted with his sentencing memorandum. (ECF Dkt No. 196) As a young child, Mr. Hart went from a drug-addicted and unstable father, often imprisoned and basically absent from Rick's life, to an abusive stepfather, to being shuttled from one family member to another, one location to another, all culminating in his leaving school in 9th grade. At the age of 14 he entered into the adult world on his own, left to make his way without parental or other adult guidance. Under constant pressure to succeed, work, and earn money, he fell prey at an early age to substance abuse. Finally, in 2010, realizing he could not continue down that road, he sought drug treatment. Remarkably, through the years of addiction, Mr. Hart was able to maintain employment. With his marriage to his wife in 2012, and with her continued support, Mr. Hart remains free of illicit drug use.

Ms. Hart gave birth to their son in 2014, He quickly became the focus and emotional center of their life together. While their son is the joy of the Harts' life, ▮▮▮▮▮▮▮▮▮▮, (Exhibit B, C and D) ▮▮▮▮▮▮▮▮▮▮, Ms. Hart stopped working so that she could be with him 24 hours a day, seven days a week, which increased the pressure on Mr. Hart to maintain the family finances. As a result of Mr. Hart's arrest in this case, his wife was forced to return to work.

By all accounts, including the numerous letters and my own interactions with the family, and with Megan Hart in particular, Mr. Hart is, and has always been, a crucial presence in their son's life, and continues to play a vital role in his care and well-being. While there is always "collateral damage" whenever a parent is incarcerated, in this case, due to the death of their brother-in-law, the coronavirus and Ms. Hart being an essential employee, that damage has been magnified since Mr. Hart's sentence originally was imposed.

**(2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C))**

Here, there are two overriding factors under § 3553(a) that was not present at the time of sentencing. First is the COVID-19 pandemic and the serious risk it presents inside prisons in general and specifically to Richard Hart. Second is the death of Mr. Hart's brother-in-law who took care of the Harts' son. COVID-19 has magnified the effect of this loss as Ms. Hart is considered an essential worker and schools have been closed, leaving no time that their son is not in need of a caretaker.

Although the circumstances of the offense qualified Mr. Hart for the sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness and the terror of facing that risk of lethal infection every single day. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions"). Nor does just punishment at this point, particularly given that only approximately two months of his sentence are remaining, warrant inflicting additional damage on his son. Because of the combination of circumstances described above, he is unable to live with his mother, indeed he is unable to see her. This is particularly damaging given his high needs. The 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release

The MDC is a difficult place to be imprisoned at any time, but it's truly horrific right now. Mr. Hart is completely locked down, shut off from his family and loved ones, and living in fear of a deadly disease. Mr. Hart's first and only experience with being incarcerated has been entirely at the MDC, and during the past three months on total or partial lockdown. He has been locked in his cell for approximately 23 hours a day seven days a week. He has had no access to commissary for days at a time. Recently, he has been unable to shower for days at a time. He has had no family visits for the past three months, and has not seen his son for that entire time.

Mr. Hart has no history of violence and no prior criminal record. Mr. Hart's conduct while in prison, establishes that the purposes of punishment have been met and that his release would not present any risk to the safety of the community. There can be no doubt that Mr. Hart has been punished, adequately deterred and is not a danger to the community.

**(3) The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care or other corrective treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D)).**

All educational and vocational programs that Mr. Hart was in the progress of completing have been suspended during the lockdown and will likely not resume before he is scheduled to be released in two months and, if resumed, unlikely to be completed.

Mr. Hart arrived at the MDC with a letter from Dr. Robert C. Smith M.D., Ph.D. describing the medications and treatment he had been providing Mr. Hart on a continuous basis since June 2016. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On October 16, 2019 MDC medical disregarded Dr. Smith's professional opinion and discontinued his medications replacing them with alternative mediations. (Exhibit G, p. 98)

He is not receiving the current medical care the MDC medical staff ordered. After being diagnosed with hypertension his medical records reflect that he was supposed to be monitored weekly. He was never monitored again due to the lockdown put in place in an attempt to stymie the spread of coronavirus. (Exhibit G, pgs. 1-6)

17

The totality of the circumstances demonstrates that reducing Richard Hart's sentence to time served is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

**Mr. Hart's Release Plan to Ensure his Safe, Healthy Transition to the Community**

Mr. Hart plans to live at home with his wife and son. Someone from his family or from the Federal Defenders office, or if necessary, I will be there upon his release to meet him with a mask and gloves and get him to his home where there is a room and a bathroom where he can safely quarantine and adequately follow CDC guidelines.

## Conclusion

While we do not suggest that the sentence originally imposed was anything but just, the calculus has changed since then. It is certain that neither the government nor the Court sought or intended for the sentence imposed to subject Mr. Hart to potential death, a severe medical ailment, or the detrimental psychological effects resulting from the combination of a deadly pandemic and conditions at the MDC that make it impossible to follow CDC guidelines required to survive and protect ourselves during this pandemic.

In these unique circumstances it is far safer for Richard Hart to live at home and in doing so allow him to follow CDC guidelines to better protect against contracting coronavirus. By granting this motion the Court would be facilitating the reduction in population at a BOP facility, which will in turn assist the BOP in fulfilling its duty to ensure safe and adequate conditions for the inmates that remain as well as the staff.

Additionally, the death of his brother-in-law and his wife's status as an essential employee has created extraordinary and compelling circumstances for his family, which warrant a reduction in his sentence.

For the foregoing reasons, defense counsel respectfully requests that the Court reduce Richard Hart's sentence of incarceration to time served and order that he be released immediately to supervision with the condition that he be subject to home confinement until his sentence of incarceration would have ended.

Dated: June 10, 2020

                                              Respectfully submitted,

                                               */s/ Jacob B. Mitchell*

                                              Jacob B. Mitchell
                                              Attorney for Defendant