

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 19, 2020

**By ECF**

Hon. Vernon S. Broderick
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

      Re:  <u>United States v. Richard D. Hart, S1 17 Cr. 248 (VSB)</u>

Dear Judge Broderick:

  The Government writes in response to defendant Richard D. Hart's second motion for compassionate release, dated June 10, 2020, and the Court's Order of June 11, 2020. The Government respectfully submits that this second motion should be denied.

## BACKGROUND

  **A. Offense Conduct**

  For more than three years, the defendant played a leadership role in a multimillion-dollar credit-card-processing fraud scheme, and personally collected more than $500,000 in profits. (Presentence Report ("PSR") ¶¶ 29, 114).

  At Commerce Payment Systems ("CPS"),[1] which he joined in December 2011, Hart was second only to CPS President Michael Mendlowitz. As the head of sales for more than three years, Hart trained and directly supervised at least 20 employees. (PSR ¶ 29). Hart pushed his subordinates relentlessly, listening to recordings of their sales calls and emailing his often-harsh critiques of their sales prowess to his entire team. (PSR ¶ 45). Hart demanded that his sales staff employ aggressive and fraudulent sales tactics, and he helped concoct new ways to defraud victims. (PSR ¶ 29).

  With Mendlowitz's approval, Hart drafted and required his employees to use sales scripts that lied about how much CPS's services would cost. The scripts deceived merchants about what rates CPS would charge, whether rates could be raised, whether certain fees would be waived, whether additional undisclosed fees would be imposed, and whether billing statements would be easily accessible. (PSR ¶ 45). For example, Hart directed sales employees to deny that CPS

---

[1] CPS also employed the names "Commerce Payment Group," "Merchant Commerce," "Empire Payments," "Evolution Bankcard," and "Optimal Bankcard."  (PSR ¶ 73).

charged certain annual fees he knew would be imposed, and to assure potential customers that the low rates they were promised were "guaranteed for life" even though Hart knew the rates actually charged would include a variety of additional fees. (PSR ¶ 46). During Hart's tenure as the head of sales, CPS defrauded hundreds of small business owners of more than $17 million. (PSR ¶ 29; Gov't Sentencing Mem., Dkt. No. 199, at 5-6).

CPS's fraudulent practices alienated and angered its victims, prompting some to submit online complaints warning other merchants not to fall for CPS's sales pitches. To mitigate the reputational damage, Mendlowitz, Hart, and others took steps to create new entities and brand names they used to conceal their association with CPS's fraudulent conduct. (PSR ¶ 40). In late 2014, for example, Mendlowitz and Hart created Optimal Bankcard. (PSR ¶ 42). Like the other CPS brands, Optimal Bankcard marketed its services by promising no hidden or annual fees, but in fact charged its customers various costs, including an annual "membership fee," that were not disclosed at the time the customers signed up. Marketing materials claimed that Optimal Bankcard had been in business for 10 years and was "trusted by over 300,000 merchants," including various nationally recognizable companies—all false assertions. (PSR ¶ 43).

Mendlowitz and Hart routinely created false promotional campaigns for Optimal and other CPS brands. Marketing brochures falsely claimed that these CPS brands had "no hidden fees," and websites presented phony testimonials from supposedly satisfied customers who were not, in fact, merchants receiving services from CPS. (PSR ¶¶ 39, 44). Mendlowitz and Hart even created purportedly "independent" ranking websites that promoted CPS entities. (PSR ¶¶ 41-42, 45).

**B. Hart's Sentence**

Hart pled guilty pursuant to a plea agreement, in which the parties stipulated to Hart's leadership role, to an adjusted offense level under the U.S. Sentencing Guidelines (the "Guidelines") of 28, and to a stipulated sentencing range of 78 to 97 months. Because the defendant pled guilty to a single count of conspiracy in violation of 18 U.S.C. § 371, his sentencing range was capped at the statutory maximum of 60 months' imprisonment.

At sentencing, the Court imposed a sentence of a year and a day. The Court noted that it was effecting a large downward variance primarily because of the defendant's family circumstances, but that the seriousness of the defendant's offense required no less than the sentence imposed. (Sentencing Transcript at 36-38).

The defendant surrendered to the Metropolitan Detention Center ("MDC") in Brooklyn in October 2019, and has served approximately eight months in prison. His presumptive release date is August 17, 2020. However, the Bureau of Prisons ("BOP") informs the Government that Hart is schedule to be moved to home confinement on July 14, 2020—his first date of eligibility.

BOP currently reports that, with some 1,578 inmates at the MDC, only three inmates and six staff members have confirmed active cases of COVID-19; an additional 34 inmates and eight

staff members have had the virus and recovered. *See* https://www.bop.gov/coronavirus/ (last visited June 19, 2020). This reflects a significant improvement in recent weeks, following extensive measures undertaken at the MDC. *See Chunn v. Edge*, 20 Civ. 1590 (RPK), 2020 WL 3055669 at *7-8 (E.D.N.Y. June 9, 2020).

## APPLICABLE LAW

Motions for compassionate release are governed by 18 U.S.C. § 3582, which states that a sentencing court "may not modify a term of imprisonment once it has been imposed" except under certain specific conditions. Relevant here, one such exception is that the Court

> may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission has promulgated a policy statement and accompanying application notes under U.S.S.G. § 1B1.13 addressing appropriate circumstances for a reduction in sentence pursuant to § 3582(c). Because the governing statute requires a ruling concerning compassionate release to be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A), U.S.S.G. § 1B1.13 is binding on the Court. *See Dillon v. United States*, 560 U.S. 817, 827 (2010).

The application notes to Guidelines Section 1B1.13 provide three instances where "extraordinary and compelling" reasons exist: (A) the defendant has a serious medical condition, such as a terminal illness; (B) the defendant is, among other things, at least 65 years old and seriously deteriorating; or (C) changes in the defendant's family circumstances leave the defendant as the only available caregiver for a minor child or incapacitated spouse. *See* U.S.S.G. § 1B1.13 app. note 1(A)-(C). The application notes also allow a catchall condition where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at app. note 1(D).

Hart bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Ng*, No. S5 15 Cr. 706 (VSB), 2020 WL 230212, at *3 (S.D.N.Y. May 8, 2020);

United *States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) (same).

## DISCUSSION

Hart does not carry his burden of presenting extraordinary and compelling circumstances warranting his release, and the Section 3553(a) factors the Court must consider, *see* 18 U.S.C. § 3582(c)(1)(A), weigh against granting his motion.

### A. Hart Does Not Meet His Burden of Establishing "Extraordinary and Compelling Reasons" to Reduce His Sentence

As he did in his initial motion, Hart again sets forth two grounds in support of his motion for a reduced sentence: (1) child-care issues relating to his son, and (2) Hart's own medical issues. Those grounds, however, do not meet the high bar of "extraordinary and compelling reasons" that may support compassionate release.

#### 1. *Caregiver Responsibilities*

Hart describes the sudden death of his brother-in-law in January and the difficulty that has caused in arranging care for Hart's six-year-old son. (Dkt. 265, at 3-4). Without diminishing the impact of that tragedy, it was previously before the Court when the Court denied Hart's initial motion for release in April. The only new fact pertaining to Hart's son appears to be that his son is now residing with Hart's mother-in-law, which enables Hart's wife to continue working. It thus remains the case that, unlike the example set forth in U.S.S.G. § 1B1.13 app. note 1(C), Hart is not the only available caregiver for his minor child. While the current care-giving arrangement may cause some hardship, it does not rise to the level of an extraordinary and compelling reason to order Hart's immediate release.

#### 2. *Medical Issues*

Hart next contends that his asthma and high blood pressure make him especially vulnerable to serious complications should he contract COVID-19. (Dkt. 265, at 4-13). But Hart fails to establish that he is at high risk from severe illness under Centers for Disease Control ("CDC") guidelines, or that releasing him would reduce his risk of infection.

Until the last few weeks, the available evidence indicated that Hart was a healthy 40-year-old with no significant health issues. In his PSR and at sentencing, he raised no health concerns at all. In describing defendant's physical health, the PSR makes no mention of asthma or hypertension. (PSR ¶¶ 101-02). Similarly, Hmonths
art's medical records from the MDC, including the detailed records of his initial health screening, reflect that Hart raised no concerns about asthma or high blood pressure to the MDC

medical staff during the five months of his incarceration prior to the coronavirus outbreak and the possibility of early release. (Deft. Exh. G).[2]

As Hart correctly notes, the CDC lists "moderate to severe asthma" and "serious heart conditions" as COVID-19 risk factors. (Dkt. 265, at 5). Prison medical records show that Hart first mentioned asthma to MDC medical staff when he requested treatment on May 20. (Deft. Exh. G at 1). Since that date, according to the records, Hart has made no further mention of asthma (*see* Ex. 1), indicating that the symptoms—if they are asthma—are being well-treated and, in any event, are less than "moderate to severe." The records do indicate that Hart had high blood pressure when tested on March 18, 2020, but that no medication was prescribed. (Deft. Exh. G at 60). But high blood pressure, standing alone, does not appear on the list of "serious heart conditions" that the CDC identifies as heightening the risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions (last visited June 18, 2020).

Moreover, Hart has not shown that releasing him from prison would reduce his odds of contracting COVID-19. He states that, if released, he would "live at home with his wife and son." (Dkt. 265, at 18). But Hart's wife, as an essential worker at a senior-living center (*see* Deft. Exh. F), seems particularly likely to be exposed to COVID-19, which she could then transmit to Hart. Indeed, Hart notes that his mother must remain isolated from his wife for that reason. (Dkt. 265, at 4). Hart's motion provides no basis to conclude that he would be significantly safer living with his wife than he is in a closed BOP facility.

### B. The Section 3553(a) Factors Do Not Justify a Reduced Sentence

Finally, granting Hart's motion would be inconsistent with the § 3553(a) factors. Hart played a leadership role in a multi-million-dollar fraud scheme that victimized thousands of small businesses. For the same reasons Hart's year-and-a-day prison sentence was appropriate when it was imposed. A reduced sentence would not suffice to reflect the seriousness of Hart's offense, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(A)-(B).

---

[2] Defendant's Exhibit G is defendant's BOP medical records through May 20, 2020. Attached hereto as Exhibit 1 are Hart's medical records from May 20 to June 15, 2020. Notwithstanding the well-established presumption of open access, *see United States v. Amodeo*, 71 F.3d 1044, 1048-50 (2d Cir. 1995), the Government respectfully requests permission, in order to protect Hart's privacy interests, to file Exhibit 1 under seal, with a copy to be provided to the Court via email. *See generally* SDNY Electronic Case Filing Rules & Instructions § 21.4 (urging parties to exercise "[c]aution" when filing documents that contain, *inter alia*, "[m]edical records, treatment and diagnosis").

## **CONCLUSION**

For these reasons, Hart's motion for a modification of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   <u>/s/</u>
David Raymond Lewis / David Abramowicz
Assistant United States Attorneys
(646) 787-5645 / (212) 637-6525

cc:   Eric Sears, Esq.
      Jacob Mitchell, Esq.